## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Rita Marie Dilworth, | : | Case No. 4:11-CV-00119 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND** |
| | | **RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act).  Pending are  Plaintiff's unopposed Motion for Summary Judgment (Docket No. 10) and the parties' Briefs on the Merits (Docket Nos. 11 & 12).  For the reasons set forth below, the Magistrate recommends that the Court deny the Motion for Summary Judgment as moot and affirm the Commissioner's decision.

### I. MOTION FOR SUMMARY JUDGMENT.

Plaintiff filed a Motion for Summary Judgment, without a supporting memorandum, and proposed order.  The Magistrate finds that this administrative case is governed by the Court's order entered on April 6, 2011 (Docket No. 9).  In the interest of the orderly and efficient disposition of this

action and to afford the parties an opportunity to affirmatively present their factual and legal arguments, a briefing schedule was imposed so that the parties could delineate the legal issues, list the facts in dispute, direct the Court's attention to the appropriate citations to the transcript and apprise the Court of the relief requested.

Plaintiff has listed the legal issues, facts in dispute, the relief requested and the relevant transcript pages in her Brief on the Merits. The issues in this case have been resolved based upon arguments presented in the Brief on the Merits. The Motion for Summary Judgment is merely a restatement of Plaintiff's prayer for relief. It offers nothing to assist in the clarity of the issues, legal argument or requests for relief. Neither does it supplement that facts. Therefore, the Magistrate recommends that the Court deny, as moot, the Motion for Summary Judgment.

## II. BRIEFS ON THE MERIT.

### A.    PROCEDURAL BACKGROUND.

On January 25, 2008, Plaintiff completed an application for DIB, alleging that she became unable to work because of her disabling condition on October 1, 2007 (Docket No. 8, Attachment 7, pp. 2-4 of 16). The application for DIB was denied initially and upon reconsideration (Docket No. 8, Attachment 5, pp. 2-5, 9-11 of 37). A hearing was conducted on April 13, 2009, before Administrative Law Judge (ALJ) J. E. Sullivan. Plaintiff, represented by counsel, appeared and testified. Vocational Expert (VE) Frances Kinley appeared and testified (Docket No. 8, Attachment 3, p. 2 of 51). On June 22, 2009, the ALJ rendered a decision and concluded that Plaintiff was not entitled to a period of disability and DIB (Docket No. 8, Attachment 2, pp. 16-28 of 32). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on November 29, 2010 (Docket No. 8, Attachment 2, pp. 2-4 of 32).

Plaintiff filed a timely Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).  The parties filed briefs and Plaintiff filed a Motion for Summary Judgment.

**B.     FACTUAL BACKGROUND.**

      **1.     PLAINTIFF'S TESTIMONY**.

Plaintiff, a high school graduate, was separated from her spouse.  She and her two children, aged 14 years and 18 years, resided together (Docket No. 8, Attachment 3, p. 9 of 51).  Their sole source of support was child support in the amount of approximately $500 monthly (Docket No. 8, Attachment 3, p. 36 of 51).

Plaintiff's family history included mental impairments such as depression, schizophrenia and bipolar disorders.  The onset of debilitating symptoms of severe depression occurred several weeks before September 18, 2007, the date her husband abandoned her and threatened to divorce her (Docket No. 8, Attachment 3, pp. 11-12, 17, 40 of 51).  Upon self-admission, Plaintiff sustained one week of inpatient treatment at the Laurelwood Psychiatric Hospital.  Although she left the institution prematurely to care for her children, Plaintiff's mental condition showed signs of improvement at discharge (Docket No. 8, Attachment 3, p. 27 of 51).  Thereafter, Plaintiff commenced outpatient counseling and drug therapy under the supervision of a psychotherapist and a psychiatrist (Docket No. 8, Attachment 3, pp. 13-14, 31 of 51).

Plaintiff also suffered from panic attacks three times weekly.  The panic attacks were marked with symptoms that replicated suffocation, dizziness and a heart attack.  The panic attacks were routinely treated with the application of cold compresses and relaxation (Docket No. 8, Attachment 3, p. 17 of 51).

3

In addition, Plaintiff had physical impairments, specifically, irritable bowel syndrome, characterized by persistent diarrhea, and fibromyalgia, a common syndrome in which a person has body wide pain and tenderness in 11 of 18 specified sites (Docket No. 8, Attachment 3, p. 21 of 51; STEDMAN'S MEDICAL DICTIONARY, 148730 (27th ed. 2000) (Thomson Reuters 2011).

Plaintiff contends that her mental illness, severe headaches, anxiety, stress, "sleep problems" and panic attacks interfered with her ability to work (Docket No. 8, Attachment 3, pp. 14-16 of 51). Her past relevant work included employment as a finisher of pottery/ceramics.  In that capacity she used her hands, a lathe, a saw, knives, gauges or a sander to remove debris and smooth ceramic products (Docket No. 8, Attachment 3, pp. 10-11 of 51).  Plaintiff attributed her decreased productivity to psychological abnormalities such as impaired concentration and memory (Docket No. 8, Attachment 3, p. 12 of 51).

Plaintiff's impairments responded well to the drug therapy; however, the side effect of her medications was chronic sleepiness.  Because she was chronically sleepy, her ability to concentrate or engage in daytime activities was impaired (Docket No. 8, Attachment 3, pp. 22, 25 of 51).  So on a typical day, Plaintiff arose with her children and then returned to the bed or the couch where she lounged with the television on most of the day.  Her children prepared their own meals and washed the clothes.  Plaintiff got "stressed out" when she attempted to complete household chores.  As a result she started projects and her children completed them.  For instance, her husband paid child support and her children tendered payment of the utility bills from the child support (Docket No. 8, Attachment 3, pp. 18-19, 20 of 51).  Occasionally she drove (Docket No. 8, Attachment 3, p. 23 of 51).

## 2. THE VE'S TESTIMONY.

The VE explained that her testimony was consistent with the information in the DICTIONARY

4

OF OCCUPATIONAL TITLES (DOT) and its companion publication (Docket No. 8, Attachment 3, p. 49 of 51).  The DOT is a standardized occupational guide designed to show how jobs are performed in the majority of industry across the country and to match the appropriate jobs and workers (Www.occupationalinfo.org)

The VE defined the local region within which Plaintiff's employment opportunities would originate as bound by the States of West Virginia, Ohio and Pennsylvania.  Plaintiff's past relevant work within the fifteen years preceding the hearing was categorized as a finisher for pottery/porcelain.  This job, described in the DOT at 774.684-018, was considered light work which required more than three months and up to six months' specific vocational preparation and had no transferrable skills obtained through the job (Docket No. 8, Attachment 3, p. 45 of 51; www.onetonline.org).

    a.      THE HYPOTHETICAL QUESTIONS POSED TO THE VE BY THE ALJ.

In the first hypothetical question, the ALJ queried Plaintiff's residual functional capacity, noting that Plaintiff had no exertional, postural or environmental limitations visible from the medical records.  Assuming that Plaintiff was limited to simple, routine and repetitive work, performed in a low-stress work environment and free from fast-paced production or strict production requirements, with only occasional interaction with either the public or co-workers, the VE responded that Plaintiff could not return to her past relevant work as her job involved production quotas or fast-paced assembly line-like work (Docket No. 8, Attachment 3, p. 46 of 51).  However, there were jobs available in DOT that had a number of regional and nationwide jobs that Plaintiff could perform given her residual functional capacity:

| JOB | DOT IDENTIFICATION | NUMBER OF JOBS NATIONWIDE | NUMBER OF JOBS REGIONALLY |
|---|---|---|---|
| CLEANER | 323.687-014 | 400,000 | 50,000 |
| PACKING | 753.687-038 | 160,000 | 20,000 |

| Laundry | 584.685-042 | 70,000 | 6,000 |

(Docket No. 8, Attachment 3, pp. 46-47 of 51).

Assuming as credible Plaintiff's claims that she had (1) severe headaches several times a week, (2) severe anxiety daily, (3) difficulty sleeping at night and (4) panic attacks on an average of three times weekly after which several days were needed to recover, the VE opined that there would be no work for her to perform (Docket No. 8, Attachment 3, pp. 47-48 of 51).

**b.**  **THE HYPOTHETICAL QUESTIONS POSED TO THE VE BY PLAINTIFF'S COUNSEL.**

Counsel asked the VE to assume that Plaintiff was unable to complete a normal workday.  The VE explained that if the claimant were to be absent three to four times, leave work early, arrive late, fail to appear or engage in any other behavior that was not pre-approved beyond the employer's normal tolerances, the claimant would lose his or her job.  If Plaintiff had a concentration deficit-type limitation, she would be unable to keep a job (Docket No. 8, Attachment 3, p. 48 of 51).

**C.**  **MEDICAL EVIDENCE.**

Medical evidence is the cornerstone for the determination of a disability.  The summation of Plaintiff's physical and mental medical evaluations follows.

**1.**  **PLAINTIFF'S PHYSICAL IMPAIRMENTS.**

On March 23, 2000, Dr. William Z. Kolozsi, M. D., a gastroenterologist, addressed Plaintiff's abdominal cramps and pain associated with bouts of shortness of breath, lightheadedness and numbness and tingling around the mouth and the extremities (Docket No. 8, Attachment 10, p. 16 of 30).

In May 2000, the contents from colon biopsies showed evidence of chronic, nonspecific inflammation (Docket No. 8, Attachment 10, p. 5 of 30).  The "scope" of the descending and sigmoid colon showed evidence of significant spasms with areas of substantial segmentation (Docket No. 8,

Attachment 10, p. 13 of 30).

The upper gastrointestinal series administered on July 21, 2000, did not show the etiology of epigastric pain. The barium meal failed to reveal evidence of abnormality of the esophagus, the stomach filled out well with no evidence of intraluminal (intratubal) defects or ulcers or craters and the duodenal bulb and loop appears normal (Docket No. 8, Attachment 10, p. 10 of 30; STEDMAN'S MEDICAL DICTIONARY 208260, 27th 3ed. 2000)).

On May 20, 2001, a small cyst was detected on Plaintiff's right ovary without other evidence of abnormality (Docket No. 8, Attachment 10, p. 8 of 30).

On December 26, 2001, Dr. China Potluri, an emergency room physician, ordered multiple axial images of the abdomen and pelvis. Diverticulosis (presence of a number of diverticula of the intestine) of the sigmoid colon was noted and there was a small focal area of inflammation surrounding the sigmoid colon consistent with diverticulitis (inflammation of the diverticulum, especially of the small pockets in the wall of the colon which fill with stagnant fecal material and become inflamed). No acute cardiopulmonary pathology or intra-abdominal pathology was identified (Docket No. 8, Attachment 10, pp. 9, 11 of 30; STEDMAN'S MEDICAL DICTIONARY 117630, 117660, 27th ed. 2000)).

Dr. Kolozsi ordered tests to determine whether Plaintiff had gastroesophageal reflux disease (GERD). On May 16, 2002, Plaintiff underwent an abdomen series examination. The results from the test were normal (Docket No. 8, Attachment 10, p. 3 of 30). Plaintiff underwent gastric emptying study on April 18, 2003. The results from this test, too, were normal (Docket No. 8, Attachment 10, p. 2 of 30).

On October 9, 2006, Dr. Magdy K. Iskander, M. D, M. P. H., a rheumatologist, reviewed the clinical picture of Plaintiff's generalized musculoskeletal aches and pains. As treatment, Dr. Iskander

stressed the importance of low impact aerobic exercises and management of fibromyalgia. The importance of continuing Cymbalta at the same dosage was stressed (Docket No. 8, Attachment 10, p. 21 of 30). On September 11, 2007, Dr. Iskander diagnosed Plaintiff with degenerative osteoarthritis in the cervical spine without spinal cord pathology, osteoarthritis of the feet and mild right carpal tunnel syndrome and conducted a reevaluation of fibromyalgia and underlying depression and anxiety. Dr. Iskander advised Plaintiff to increase the Cymbalta (Docket No. 8, Attachment 10, pp. 18-19 of 30).

Dr. James M. Essad, D. O., a board certified radiologist, determined on June 24, 2009, that there was no evidence of acute cardiopulmonary pathology. There were, however, marked nasal turbinate engorgement and minimal spondylosis at the C6-C7 level (Docket No. 8, Attachment 15, p. 18 of 36).

On June 27, 2009, Plaintiff underwent an echocardiogram. Dr. Richard T. Esper, M. D., a specialist in cardiology and internal medicine, opined that the left ventricular size and systolic function were normal, there were grossly normal right ventricular size and systolic function, there was mild left atrial dilatation and mild tricuspid insufficiency with normal pulmonary function and there was no aortic stenosis or insufficiency (Docket No. 8, Attachment 15, p. 15 of 36). Plaintiff's "good and bad" cholesterol and total protein levels were out of range (Docket No. 8, Attachment 15, pp. 16-17 of 36).

On July 7, 2009, Plaintiff underwent a scan of the lumbar spine, the left hip and abdomen. The World Health Organization (WHO) classification was indicative of osteopenia, or low bone mineral density, in the lumbar spine. The WHO classification in the left hip was normal. There was a proliferation of blood vessels that led to a mass that resembled a neoplasm in the liver which warranted further study (Docket No. 8, Attachment 15, pp. 2-5 of 36; STEDMAN'S MEDICAL DICTIONARY 174950, 27th ed. 2000)).

Ultrasounds administered on July 22, 2009, rendered the following results:

| Lower extremities | Normal |
| Carotid | Normal |
| Pelvic | Normal |
| Aorta | Normal |
| Breasts | No cystic or solid mass lesion |

(Docket No. 8, Attachment 15, pp. 6-12 of 36).

On June 8, 2010, Plaintiff presented to the Salem Community Hospital Emergency Room with atypical chest pain and joint pain in the shoulder (Docket No. 8, Attachment 18, pp. 3, 5 of 22). The electrocardiogram showed normal sinus rhythm and no acute abnormalities (Docket 8, Attachment 18, pp. 11, 18, 21 of 22). Plaintiff's potassium and red blood counts were low. Her glucose levels were elevated (Docket No. 8, Attachment 18, pp. 15, 17 of 22).

2.      PLAINTIFF'S MENTAL IMPAIRMENTS.

Plaintiff was brought into the emergency room at Forum Health-Western Reserve Care System on October 17, 2007, where she underwent a comprehensive psychological evaluation. Plaintiff had no physical symptoms but she did report depression, suicidal ideations, increased anxiety, persistent crying and severe headache (Docket No. 8, Attachment 11, pp. 3-4 of 22).

From October 18, 1007 through October 24, 2007, Plaintiff was treated for major depressive disorder at the Windsor-Laurelwood Center for Behavioral Medicine. Upon admission, she indicated that she could not "take it anymore." The Center implemented suicide precautions. At that time, Plaintiff had a global assessment of functioning (GAF) score of 44. GAF is a reflection of the evaluating clinician's judgment of a patient's ability to function in daily life. The 100-point scale measures psychological, social and occupational functioning. It was determined that based on a score of 44, Plaintiff exhibited behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas (ex: stays in bed

9

all day, no job, no home, no friends) and serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).  She was discharged under a continuing care plan (Docket No. 8, Attachment 12, pp. 2-12 of 45; psyweb.com).

Referred by Windsor Laurelwood Hospital, Vicky from Family Recovery Center (FRC) conducted a telephonic intake on October 22, 2007.  Plaintiff commenced undergoing counseling services at FRC to address the symptoms related to major depressive disorder, panic disorder without agoraphobia and anxiety disorder, not otherwise specified.  Marilyn Latham, M. Ed., L.P.C.C, L.I.C.D.C., a licensed independent chemical dependency counselor and a clinical supervisor, provided this history to Dr. Vidya Counto, M. D., to facilitate coordinating Plaintiff's care (Docket No. 8, Attachment 12, pp. 13-21 of 45).

On November 1, 2007, Dr. Pamela Drake, M. D., a psychiatrist, conducted a diagnostic evaluation (Docket No. 8, Attachment 12, pp. 14-16 of 45).  In November 7, 2007, Plaintiff presented to A. Lewis-Nash, a licensed social worker, who diagnosed Plaintiff with a severe major depressive disorder, single episode, without psychotic features (Docket No. 8, Attachment 14, p. 30 of 30).  On November 30, 2007, Plaintiff reported to Dr. Drake that she was sleeping better and her feelings of anxiety had improved.  The concentration problems, however, persisted (Docket 8, Attachment 12, p. 18 of 45).  Plaintiff's current GAF score was 54 and her highest GAF score exhibited during the year was 60.  These scores denoted moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational ,or school functioning (ex: few friends, conflicts with peers/co-workers) (Docket No. 8, Attachment 12, p. 16 of 45; psyweb.com).

On December 10, 2007, Ms. Marilyn Latham, the clinical supervisor, reported that Plaintiff was

being treated at the FRC for a major depressive disorder recurrent and severe, a panic disorder without agoraphobia and an anxiety disorder, not otherwise specified.  Plaintiff had moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 8, Attachment 12, pp. 13-17 of 45).

On January 10, 2008, Plaintiff commenced individual therapy and/or counseling with Mary Ann Snyder, M.Ed., P.C.C., L.C.D.C., a professional licensed mental health counselor.  The plan was to begin working on a 5-year plan of happiness as well as work on Plaintiff's coping skills (Docket No. 8, Attachment 12, pp. 25, 27 of 45).  On January 11, 2008, Plaintiff reported to Dr. Drake symptoms consistent with an attention deficit disorder.  Dr. Drake attributed Plaintiff's increased anxiety to caffeine usage and she linked Plaintiff's stress to the recurrence of decompensation.  A prescription for Prozac was continued (Docket No. 8, Attachment 12, pp. 19-20 of 45).

On January 31, 2008, the dosages of Plaintiff's medication were altered to reduce the severity of side effects (Docket No. 8, Attachment 12, p. 21 of 45).  Despite absences from several appointments due to illness, Plaintiff reported doing well on February 19, 2008.  Plaintiff expressed a desire to continue counseling once she resolved her financial issues (Docket No. 8, Attachment 12, p. 22 of 45).

In February 2008, Plaintiff reported that symptoms had increased and she was not sleeping well.  The medications were helpful, especially the Klonopin taken as part of a regimen that included Prozac and Celexa.  The dosage of Prozac was decreased and the dosage of Celexa was increased (Docket No. 8, Attachment 12, p. 44 of 45).

On March 7, 2008, Dr. William Price, M. D., a psychiatrist, diagnosed Plaintiff with major depression, single episode, and a generalized anxiety disorder (Docket No. 8, Attachment 13, p. 4 of 38).  He explained that at her last appointment, Plaintiff exhibited signs of anhedonia (absence of

11

pleasure from the performance of acts that would ordinarily be pleasurable), hopelessness, helplessness, sleep deprivation, appetite deprivation and excessive crying (Docket No. 8, Exhibit 13, p. 3 of 38; STEDMAN'S MEDICAL DICTIONARY 23060 (27th ed 2000)).

Dr. Karla Voyten, Ph. D., a clinical psychologist, opined on May 3, 2008, that Plaintiff had a medically determinable impairment, namely, a major depressive disorder, recurrent, severe, anxiety disorder and dependent traits (Docket No. 8, Attachment 13, pp. 12-14 of 38).  Dr. Voyten explained that Plaintiff was moderately limited in her ability to:

- • Understand and remember detailed instructions.
- • Carry out detailed instructions.
- • Maintain attention and concentration for extended periods.
- • Sustain ordinary routine without special supervision.
- • Work in coordination with or proximity to others without being distracted by them.
- • Complete a normal workday and workweek without interruptions from psychologically based symptoms.
- • Accept instructions and respond appropriately to criticism from supervisors.
- • Get along with coworkers and peers without distracting them or exhibiting behavioral extremes.
- • Respond appropriately to changes in the work setting.
- • Set realistic goals or make plans independently of others.

(Docket No. 8, Attachment 13, pp. 5-7 of 38).

Dr. Voyten's based her medical opinion on the presence of a major depressive disorder, recurrent, severe, an anxiety disorder and a dependent trait disorder (Docket No. 8, Attachment 13, pp. 12, 14, 16 of 38).  As a result of these mental disorders, Plaintiff had a moderate degree of limitations in the restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace.  She experienced episodes of decompensation once or twice annually (Docket No. 8, Attachment 13, p. 19 of 28).

On August 13, 2008, Plaintiff presented again to Mr./Ms. Nash with a complaint that she had quit her job as everything bothered her.  Ms./Mr. Nash noted that the presenting problem included

severe depression and suicidal thoughts; consequently, Plaintiff was diagnosed with bipolar II, a mental illness in which less intense elevated moods never reach "full-on mania." Mr./Ms. Nash opined that Plaintiff had a GAF of 53. A score of 53 essentially identifies a person with moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 8, Attachment 14, pp. 27-28 of 30; psyweb.com; www.webmd.com/bipolar-disorder).

Mary K. Theil, a clinical therapist, provided individual psychotherapy beginning in August 2008. Ms. Theil compiled a working diagnosis of a bipolar disorder (an affective disorder characterized by the occurrence of alternating periods of euphoria and depression), not otherwise specified, and a generalized anxiety disorder (Docket No. 8, Attachment 14, pp. 9, 25 of 30; STEDMAN'S MEDICAL DICTIONARY 116700 (27th ed. 2000)).

On August 19, 2008, Dr. Drake completed a mental impairment questionnaire in which she opined that Plaintiff had marked limitations in maintaining social functioning and marked deficiencies in concentration persistence and pace. She noted that increased mental demands would cause the development or worsening of a mental disorder. Dr. Drake ascribed a current GAF of 54 and the highest GAF that Plaintiff exhibited during the year was 60. These scores identify a person with moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 8, Attachment 13, pp. 25-26 of 38; psyweb.com).

Further, Dr. Drake opined that Plaintiff had the following marked limitations in the ability to:

- Remember locations and work-like procedures.
- Respond appropriately to expected or unexpected changes in the work setting.
- Set realistic goals or to make plans independently of others.
- Understand and remember very short and simple repetitive instructions or tasks.
- Understand and remember detailed instructions or tasks which may or may not be repetitive.
- Carry out detailed instructions which may or may not be repetitive.
- Maintain attention and concentration for extended periods . . .  with four such periods

13

- in a workday.
- Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
- Work in coordination with or proximity to others without being unduly distracted by them.
- Make simple work related decisions.
- Complete a normal workday and workweek without interruptions.

(Docket No. 8, Attachment 13, pp. 32-34 of 38).

Dr. Drake opined that Plaintiff would be unable to complete a workday more than three or four times per month.  The limitations in this assessment were expected to last twelve continuous months (Docket No. 8, Exhibit 13, p. 35 of 38).  Dr. Drake monitored Plaintiff's drug therapy which included her consumption of:

- Abilify®, a drug used to treat symptoms of schizophrenia (PHYSICIANS' DESK REFERENCE, 2006 WL 367852 (Thomson Reuters 2011);
- Ambien®, a sleep medication used to treat insomnia (PHYSICIANS' DESK REFERENCE, 2006 WL 387951 (Thomson Reuters 2011); and
- Seroquel®, a psychotropic agent used to treat symptoms of bipolar mania and schizophrenia PHYSICIANS' DESK REFERENCE, 2006 WL 355324 (Thomson Reuters 2011).

(Docket No. 8, Attachment 14, pp. 3-8 of 30).

On September 8, 2008, Plaintiff commenced psychotherapy at the Columbiana County Mental Health Clinic.  Ms. Theil addressed with Plaintiff, *inter alia*, methods of coping, self esteem issues and managing her symptoms (Docket No. 8, Attachment 16, pp. 10-30, 32-39 of 39; Attachment 17, pp. 2-6 of 20).  Ms. Theil noted that Plaintiff felt less depressed and uptight during the weeks preceding April 29, 2009.  However, Plaintiff had become distressed close to the time of her social security hearing. The session on April 29, 2009, focused on emotions management and distress tolerance skills (Docket No. 8, Attachment 16, p. 31 of 39).

On January 7, 2009, Dr. Vincent Paelone, M. D., a psychiatrist, commenced the supervision of Plaintiff's intake of the following combination of medications:

14

- Clonazepam, a drug designed to exert antiseizure and antipanic properties (PHYSICIANS' DESK REFERENCE, 2006 WL 387499 (Thomson Reuters 2011).
- Citalopram, a drug used to treat depression (PHYSICIAN'S DESK REFERENCE, 2006 WL 368900 (THOMSON REUTERS 2011).
- Lamictal®, an antiepileptic drug used to treat bipolar disorders (PHYSICIAN'S DESK REFERENCE, 2006 WL 369271 (Thomson Reuters 2011).
- Zolpidem, a variation of Ambien®, is a hypnotic used to treat insomnia (PHYSICIANS' DESK REFERENCE, 2006 WL 387951 (Thomson Reuters 2011).

Later in January 2009, Dr. Paelone "tapered" the Lamictal and added Abilify® (Docket No. 8, Attachment 16, p. 9 of 39).  In February 2009, Dr. Paelone increased the dosage of Abilify®.  By March 9, 2009, Dr. Paelone noted that the dosage of Abilify®, appeared to cause feelings of agitation.  In addition, he noted symptoms of a bipolar disorder, not otherwise specified (Docket No. 8, Attachment 14, pp. 10-14 of 30; Attachment 16, pp. 2-4 of 39).  In April 2009, Dr. Paelone increased the dosage of Lamictal® (Docket No. 8, Attachment 16, p. 6 of 39).  In July 2009, he prescribed Neurontin®, a medication used to prevent and control seizures and to relieve nerve pain (Docket No. 8, Attachment 16, p. 4 of 39; PHYSICIAN'S DESK REFERENCE, 2006 WL 384572 (2006)).

In the interim on March 24, 2009, Dr. Paelone affirmed the decision of clinical therapist Ms. Theil who rendered the following medical source statement concerning the nature and the severity of Plaintiff's mental impairment, postulating that Plaintiff had marked limitations in the ability to:

- Maintain attention and concentration for extended periods;
- Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;
- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- Respond appropriately to expected or unexpected changes in the work setting;
- Travel to unfamiliar places and/or use public transportation;
- Set realistic goals or to make plans independently of others.

Dr. Paelone suggested that the following work stressors would increase the level of impairment beyond those indicated above:

- Unruly, demanding or disagreeable customers
- Production demands or quotas
- A demand for precision
- A need to make quick and accurate, independent decisions in problem solving on a consistent basis.

(Docket No. 8, Attachment 14, pp. 15-18 of 30).

On March 29, 2004, Dr. Paelone affirmed the opinion of clinical therapist Ms. Theil, that after twelve sessions of counseling and three sessions of psychiatric medication management, Plaintiff still had signs and symptoms of:

- Anhedonia;
- Apprehensive expectation;
- Blunt, flat or inappropriate affect;
- Bipolar syndrome;
- Decreased energy;
- Difficulty thinking or concentrating;
- Easy distractibility;
- Emotional inability;
- Emotional withdrawal;
- Feelings of guilt or worthlessness;
- Generalized persistent anxiety;
- Mood disturbance;
- Persistent disturbances of mood or affect
- Psychomotor agitation or retardation;
- Sleep disturbance;
- Severe panic attack; and
- Thoughts of suicide.

Dr. Paelone noted three episodes of decompensation (the appearance of exacerbation of a mental disorder due to failure of defense mechanisms) within twelve months, each lasting two weeks long and a residual disease process that resulted in a marginal adjustment that resulted in a minimal increase in mental demands or change in the environment predicted to cause the individual to decompensate (Docket No. 8, Attachment 14, pp. 20-22 of 30; STEDMAN'S MEDICAL DICTIONARY, 103960 (27th ed. 2000) (Thomson Reuters 2011); webmd.com).

16

In September 2009, Dr. Paelone and Ms. Theil wrote a letter of support for Plaintiff's social security claim.  They suggested that Plaintiff's current GAF was 50 and her lowest during the past year was 40.  A score of 50 identified serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).  The score of 40 identified some impairment in reality testing or communication (ex: speech is sometimes illogical, obscure, irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (ex: depressed man avoids friends, neglects family, and is unable to work) (Docket No. 8, Attachment 17, p. 20 of 20; psyweb.com).  Dr. Paelone and Ms. Theil further suggested that Plaintiff's symptoms were chronically severe and her prognosis was guarded.  The positive clinical findings that supported their diagnosis included:

- Anhedonia
- Appetite Disturbance.
- Blunt, flat or inappropriate affect.
- Decreased Energy.
- Difficulty thinking or concentrating
- Easily overwhelmed
- Emotional liability
- Feelings of guilt/worthlessness.
- Generalized persistent anxiety
- Hypersensitivity.
- Irritability.
- Mental confusion
- Mood Disturbance.
- Perceptual disturbances.
- Psychomotor agitation or retardation.
- Recurrent panic attacks.
- Sleep Disturbance.
- Social withdrawal or isolation
- Suicidal ideation or attempts

Dr. Paelone and Ms. Theil also opined that Plaintiff had marked limitations in her ability to:

- Understand and remember detailed instructions.
- Carry out detailed instructions.

17

- Maintain attention and concentration for extended periods.
- Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance.
- Complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
- Travel to unfamiliar places or use public transportation.

(Docket No. 8, Attachment 17, pp. 11-18 of 20).

On October 7, 2009, Plaintiff underwent a diagnostic intake on her symptoms of depression and anxiety (Docket No. 8, Attachment 15, pp. 22 of 36). Plaintiff was diagnosed with a bipolar disorder, not otherwise specified, an anxiety disorder, not otherwise specified and a personality disorder, not otherwise specified (Docket No. 8, Attachment 15, p. 27 of 36).

Later in October 2009, Plaintiff reported to Dr. Paelone that the Neurontin helped with the symptoms of anxiety (Docket No. 8, Attachment 15, p. 30 of 36). Plaintiff treated with Ms. Theil on November 13, 2009. Plaintiff reported that she had more bad days than good; however, she was not suicidal (Docket No. 8, Attachment 15, p. 32 of 36). In December 2009, Plaintiff was dealing with anticipated separation anxiety (Docket No. 8, Attachment 15, p. 34 of 36).

**D.   DISABILITY STANDARDS.**

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). DIB is available only for those who have a "disability." *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a)

18

(same definition used in the SSI context)).

To determine disability, the Commissioner has established a sequential evaluation process for disability determinations.  20 C. F. R. § 404.1520 (a)(4) (Thomson Reuters 2011).

First, Petitioner met the insured requirements of the Act through September 30, 2013 20 C.F.R. §§ 404.1520 (a)(4)(i) and 416.920(a)(4)(i) (Thomson Reuters 2011).

Second, Plaintiff has not engaged in substantial gainful activity since October 1, 2007, the alleged onset date.  20 C.F.R. §§ 404.1520 (a)(4)(ii) and 416.920(a)(4)(ii) (Thomson Reuters 2011).

Third, Plaintiff has severe impairments, including major depression, anxiety disorder, not otherwise specified and panic disorder without agoraphobia.  20 C.F.R. §§ 404.1520 (a)(4)(iii) and 416.920(a)(4)(iii) (Thomson Reuters 2011).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his or her regular previous employment; if not, the claimant is found not disabled.  20 C.F.R. §§ 404.1520 (a)(4)(iv) and 416.920(a)(4)(iv)(Thomson Reuters 2011).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. 20 C.F.R. §§ 404.1520 (a)(4)(v) and 416.920(a)(4) (iv) (Thomson Reuters 2011).

**E.      THE ALJ'S FINDINGS**.

After careful consideration of the entire record, the ALJ made the following findings:

1.   At step one, Plaintiff met the insured status requirements of the Act through September 30, 2013.  Plaintiff had not engaged in substantial gainful activity since October 1, 2007, the alleged onset date (of disability) (20 C.F.R. §§ 404.1520(b) and 404.1571).

19

2.  At step two, Plaintiff had severe impairments:  major depression, anxiety disorder, not otherwise specified (NOS) and panic disorder without agoraphobia.

3  At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  At step four the ALJ considered Plaintiff's residual functional capacity to perform a full range of work at all exertional levels except that she was limited to simple routine and repetitive tasks performed in a low stress environment; and she may have only occasional interaction with the public and co-workers.

5.  At step five, the ALJ found that Plaintiff was unable to perform any past relevant work. Considering that Plaintiff was 50 years of age, had at least a high school education, was able to communicate in English and had a residual functional capacity to the extent specified in paragraph four above, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform.

6.  In conclusion, Plaintiff was not under a disability, as defined in the Act, from October 1, 2007 through the date of the decision on June 22, 2009.

(Docket No. 8, Attachment 2, pps. 16-28 of 32).

**F.**     **STANDARD OF REVIEW**.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*.  *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).  "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id*. at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide

questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

**G.**     **DISCUSSION**.

Plaintiff asserts two claims:

(1)     The ALJ failed to follow the treating physician rule when considering the opinions of Drs. Drake and Paelone.
(2)     The ALJ failed to properly evaluate Plaintiff's credibility.

Defendant contends that:

(1)     Substantial evidence supports the ALJ's finding that the opinions of disability of Drs. Drake and Paelone were entitled to little weight.

21

(2)     Substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not fully credible.

**1.  PLAINTIFF'S CLAIM THAT THE TREATING PHYSICIAN RULE WAS IMPROPERLY APPLIED.**

Plaintiff asserts that the ALJ gave little weight to the opinions of treating psychiatrist Drs. Drake and Paelone.  Both found that Plaintiff had marked limitations in functioning consistent with the GAF assigned by each.  The ALJ failed to find the opinions regarding episodes of decompensation credible.

**a.  THE TREATING PHYSICIAN RULE.**

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight. *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. § 404.1527(d)(2)).  "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir.2007)).  Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007)).  Opinions of specialist with respect to the medical condition at issue are given more weight than a nonspecialist. *Johnson, supra*, (*citing* 20 C. F. R. § 404.1527(d)(5)).

b. **DR. DRAKE**.

Plaintiff claims that the ALJ failed to apply the proper standard of review for Dr. Drake's opinions of marked limitations of functioning and decompensation. The Magistrate finds that the ALJ followed the appropriate procedure for assessing Dr. Drake's opinions and determining the weight to be attributed to such opinions.

The progress notes indicate that Dr. Drake conducted Plaintiff's medication management from November 1, 2007 through August 18, 2008 with intervening psychotherapy conducted by Ms. Snyder from November 11, 2007 through January 17, 2008 (Docket No. 8, Attachment 12, pp. 42, 45 of 45). The ALJ noted that all of Dr. Drake's reports were based on Plaintiff's assertions about the severity of her mood. The stability of her mood was driven by familial and financial stressors (Docket No. 8, Attachment 2, p. 24 of 32). Dr. Drake's reports were not well-supported by medically acceptable clinical and laboratory diagnostic techniques. In fact, Dr. Drake did not conduct any laboratory tests. Neither were Dr. Drake's reports consistent with the clinical records produced during Plaintiff's hospitalization. Consequently, the ALJ did not attribute controlling weight to Dr. Drake's reports. In determining whether to give Dr. Drake's opinions less weight, the ALJ considered (1) the length of the treatment relationship beginning on November 1, 2007 and ending in February 10, 2009 (Docket No. 8, Attachment 2, pp. 22-24 of 32); (2) the frequency with which Plaintiff sought maintenance of her drug therapy--twice in November 2007, once in December 2007, thrice in January 2008, once in February 2008 and twice in April 2008, once in June 2008, August 2008, September 2008 and February 2009 (Docket No. 8, Attachment 2, pp. 22-24 of 32); (3) the nature and extent of the treatment relationship, specifically, Dr. Drake's role in monitoring the correlation of mood swings and stressors with medication maintenance (Docket No. 8, Attachment 2, p. 24 of 32); (4) the decisions for

23

medication maintenance that were based primarily on Plaintiff's assessment of her condition and the advancements made by Ms. Snyder in psychotherapy (Docket No. 8, Attachment 2, pp. 22-24 of 33); (5) the inconsistency with the evidence as a whole and particularly the evidence adduced by Ms. Snyder, Ms. Theil and Dr. Paelone (Docket No. 8, Attachment 2, p. 26 of 32); and (6) that Dr. Drake's speciality was psychiatry (Docket No. 8, Attachment 2, p. 22 of 32).

Clearly the ALJ gave deference to Dr. Drake's opinions. The ALJ explained that Dr. Drake's reports were not supported by the overall medical evidence in the record; therefore, he did not attribute controlling weight to her opinions (Docket No. 8, Attachment 2, p. 26 of 32). Since he followed the rules and considered the required factors, the Magistrate does not disturb the ALJ's decision that Dr. Drake's opinions are not entitled to controlling weight.

## C. **DR. PAELONE**.

Plaintiff claims that the ALJ improperly rejected the opinions of Dr. Paelone. The Magistrate finds that the ALJ followed the appropriate procedure for assessing the weight to be attributed to Dr. Paelone's opinions.

Dr. Paelone assumed Plaintiff's psychiatric care when her private insurance no longer covered treatment by Dr. Drake. The ALJ characterized Dr. Paelone as a treating source specializing in psychiatric medicine. The ALJ acknowledged that Dr. Paelone was not a medical professional that dealt with Plaintiff and her maladies over a long period of time. Dr. Paelone saw Plaintiff on six occasions after January 7, 2009. Dr. Paelone was unable to provide more than a superficial insight into Plaintiff's medical condition as he only supervised Plaintiff's drug therapy in conjunction with psychotherapy conducted by Ms. Theil. Modifications to the dosages in Plaintiff's drug regimen were based on Plaintiff's subjective assertions.

As a practical matter, the ALJ was not bound by the GAF scores as they quantified Plaintiff's level of functioning at the time she entered the physician's office or at the time she commenced treatment. From a diagnostic perspective, the ALJ was not required to give controlling weight to the opinions of Dr. Paelone as his medical judgment was based entirely on clinical observations made by Ms. Theil or the subjective complaints made by Plaintiff. If the ALJ truly adhered to the treating physician rule, there was no diagnostic medical tests to support Dr. Paelone's conclusion that Plaintiff's mental impairment was of the severity to cause marked functional limitations. The Magistrate finds that the ALJ considered the totality of the evidence on record and arrived at a conclusion based on that evidence. Because the ALJ conducted an appropriate review of the factors necessary to attribute less weight to Dr. Paelone's opinions and explained why he attributed less weight to Dr. Paelone's opinions, the Magistrate must defer to the ALJ's findings of fact regarding the weight attributed to Dr. Paelone's opinions.

### 2. PLAINTIFF'S ASSERTION REGARDING THE ALJ'S ERROR IN MAKING THE CREDIBILITY DETERMINATION.

Plaintiff's contends that the ALJ assessed her credibility in a vacuum, discounting her statements to the extent that they were inconsistent with the residual functional capacity he found and disregarding the panic attacks and side effects of her medication. Accordingly, Plaintiff argues that this matter should be remanded for reconsideration of her credibility and its affect on her impairment.

#### a. THE CREDIBILITY STANDARD OF REVIEW.

It is the ALJ, not the reviewing court, who evaluates the credibility of witnesses, including that of the claimant. *Rogers, supra*, 486 F.3d at 247 (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 538 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983)). The

ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (*citing* TITLES II AND XVI; EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7p, 1996 WL 374186, at * 4 (1996)).  Rather, such determinations must find support in the record.  *Id.*  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."  *Id.*  The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record.  *Id.*  Consistency of the various pieces of information contained in the record should be scrutinized.  *Id.* at 247-248.  Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.  *Id.* at 248.

   b.  **DID THE ALJ FAIL TO PROPERLY EVALUATE PLAINTIFF'S CREDIBILITY?**

   Clearly Plaintiff had an incentive to accentuate her symptoms.  However, the ALJ was not obliged to believe all of Plaintiff's testimony regarding her symptoms.  The ALJ was free to discount Plaintiff's testimony on the basis of other evidence in the record and determine whether he believed them.  To comply with the terms of the credibility paradigm, the ALJ considered such factors as the levels of medication and their effectiveness, the extent to which Plaintiff attempted to obtain relief, the

26

frequency of medical contacts and the nature of daily activities, Plaintiff's motivation and the consistency or compatibility of medical testimony with the objective medical evidence.

The ALJ determined that there was a nexus between Plaintiff's subjective condition and severe panic attacks.  The ALJ was not persuaded that Plaintiff's statements regarding the intensity and limiting effects of her mental impairments were totally credible.  The ALJ discussed multiple factors contributing to his finding, including Drs. Drake and Paelone's exacerbated functional limitations based on clinical treatment alone; reports to the counselors that Plaintiff's anxiety improved; reports to Ms. Snyder that she was doing well; the lapse of treatment for seven months; Ms. Snyder's reports that Plaintiff cognitive functioning was within normal limits except for her inability to concentrate; and a general overall inability to objectively verify Plaintiff's claim that she was unable to engage in daily activities (Docket No. 8, Attachment 2, pp. 21-26 of 32).

It is well established that these subjective measures of credibility are within the judgment of the ALJ.  In this case, the Magistrate is persuaded that the ALJ followed the rules in assessing Plaintiff's credibility and he explained his reasons for assessing Plaintiff's credibility as he did.  Therefore, the ALJ's credibility determination was not patently wrong.

### III.  CONCLUSION

For these reasons, the Magistrate recommends that the Court deny as moot the Motion for Summary Judgment, affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   December 15, 2011

### Iv.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.