UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Rita Dilworth, | ) | CASE NO. 4:11 CV 119 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | **Memorandum of Opinion and Order** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon the Report and Recommendation ("R&R") of Magistrate Judge Vernelis K. Armstrong (Doc. 13). This is a social security appeal. For the reasons that follow, the R&R is REJECTED. The decision of the Commissioner is REVERSED and this matter is REMANDED to defendant for further proceedings consistent with this opinion.

**FACTS**

In this social security appeal, plaintiff, Rita Dilworth, seeks judicial review of

1

defendant's final decision denying her claim for Disability Insurance Benefits (DIB).

Plaintiff alleges an onset date of October 17, 2007. Plaintiff was fifty years old as of this date with a 30-year prior work history as a ceramics finisher.

On October 17, 2007, plaintiff arrived at the emergency room with complaints of suicidal ideation. The records reflect that at the time of admission, plaintiff was taking Cymbalta and Vistaril, which are used to treat anxiety and depression. Plaintiff was admitted to Windsor-Laurelwood for inpatient psychiatric treatment and was prescribed Ativan, Prozac, Visatril, Xanax and Atarax. Plaintiff was discharged on October 24, 2007. She was diagnosed with major depression, recurrent, severe, dependent traits and fibromyalgia. At the time of admittance, her Global Assessment of Functioning Score ("GAF") was a 44.[1] Plaintiff was advised to follow up with Dr. Drake.

On November 1, 2007, plaintiff began seeing Dr. Drake, a board certified psychiatrist. Dr. Drake's mental status evaluation revealed rapid speech, anxious affect, depressed mood, and decreased memory. She diagnosed plaintiff with major depressive disorder and assigned a GAF score of 54.[2] From November 1, 2007 until December 3, 2008, plaintiff regularly saw Dr. Drake for medication monitoring. Dr. Drake saw plaintiff a total of 12 times during this period. Throughout this period, plaintiff would report an improvement in some symptoms, along with a worsening in other symptoms. Dr. Drake would adjust plaintiff's medications accordingly,

---

[1] A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

[2] A GAF score of 51-60 indicates moderate symptoms (flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning.

2

sometimes adding or deleting a medication and sometimes changing the dosages of medications. During this time, plaintiff was prescribed Ativan, Prozac, Visitril, Strattera, Celexa, Klonopin, Lunesta, and Lamictal. Although fearful of its effects, plaintiff obtained a part-time job. Plaintiff reported that her stress level increased and she had difficulty coping since starting her job as a cleaner. She also reported anger and verbal aggression, along with racing thoughts, increased energy, and "distractibility." Dr. Drake diagnosed plaintiff with bipolar II disorder. Shortly thereafter, plaintiff quit her part-time job. She reported improvement in her stress level.

Dr. Drake completed a Mental Impairment Questionnaire dated August 19, 2008. Dr. Drake noted that plaintiff exhibited an anxious affect, tearfulness, rapid speech and volume, suspiciousness, and an increase in psychomotor activity. She described plaintiff's prognosis as "guarded when under stress." She further indicated that plaintiff displayed the following symptoms: pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, blunt, flat or inappropriate affect, feelings of guilt of worthlessness, impaired impulse control, persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor agitation, persistent disturbances or mood or affect, emotional lability, emotional withdrawal, autonomic hyperactivity, memory impairment, and sleep disturbance.

Dr. Drake further opined that plaintiff was markedly limited in social functioning, as well as in concentration, persistence, or pace. In addition, she noted that plaintiff had "four or more" repressed episodes of decompensation within a 12-month period, each of at least two-weeks duration and that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." Dr. Drake further indicated that

3

plaintiff had a "limited ability to handle stress."

Thereafter, on August 20, 2008, Dr. Drake completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment. Dr. Drake opined that plaintiff was "markedly" limited in the following areas:

- The ability to remember locations and work-like procedures;

- The ability to respond appropriately to (a) expected, or (b) unexpected, changes in the work setting;

- The ability to set realistic goals or to make plans independently of others;

- The ability to understand and remember very short and simple (one or two-step) repetitive instructions;

- The ability to understand and remember detailed (3 or more steps) instructions or tasks which may or may not be repetitive;

- The ability to carry out detailed (3 or more steps) instructions which may or may not be repetitive;

- The ability to maintain attention and concentration for extended periods;

- The ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;

- The ability to work in coordination with or proximity to others without being unduly distracted by them;

- The ability to make simple work-related decisions; and

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

Dr. Drake further indicated that plaintiff would be unable to complete a workday "more than three or four times per month."

After losing health insurance coverage, plaintiff stopped seeing Dr. Drake and began

4

seeing Dr. Vincent Paolone, another board certified psychiatrist. Plaintiff saw Dr. Paolone on a monthly basis beginning in January of 2009 and continuing through at least July of 2009. Like Dr. Drake, Dr. Paolone also filled out a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment. Dr. Paolone found plaintiff "markedly limited" in six areas of functioning, including the abilities to: maintain attention, perform activities within a schedule, complete a normal workday and workweek without interruption from psychologically based symptoms, adapt to changes in the workplace, travel or use public transportation, and set realistic goals or make plans independently of others. And, like Dr. Drake, Dr. Paolone opined that disagreeable customers, production quotas, the need for precision, and the need to make quick decisions would exacerbate these levels of impairment. In addition, Dr. Paolone also opined that plaintiff would be absent from work "more than three or four times per month."

Dr. Paolone also completed a Mental Impairment Questionnaire. Dr. Paolone's responses are largely consistent with those of Dr. Drake. Dr. Paolone found plaintiff to be "markedly limited in concentration, persistence, or pace," and noted "four or more" periods of decompensation within a 12-month period, each lasting at least two weeks. Dr. Paolone further opined that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." And, like Dr. Drake, Dr. Paolone opined that plaintiff would have difficulty working at a regular job on a sustained basis due to plaintiff's "very low stress tolerance."

In addition to seeing Drs. Drake and Paolone, plaintiff also regularly saw psychotherapists. Immediately after her discharge from the inpatient psychiatric hospital,

plaintiff began seeing Ms. Snyder. Ms. Snyder saw plaintiff six times during a two-month period. Ms. Snyder completed a Mental Status Questionnaire on February 25, 2008. With regard to plaintiff's anxiety, Ms. Snyder indicated that plaintiff suffered from "agitation, excessive worry, fatigue, irritability, poor concentration, restlessness, sleep disturbance, tension, and panic attacks." Ms. Snyder further reported that plaintiff's cognitive function was "within normal limits," with the exception of concentration. With regard to all other categories, Ms. Snyder reported "no impairments." In addition, Ms. Snyder opined that plaintiff would have "no problem" reacting to the pressures involved in performing simple and routine, or repetitive tasks.

Beginning in August of 2008, plaintiff commenced psychotherapy with Mary K. Theil.[3] From August of 2008 through the date of the Appeals Council decision, plaintiff saw Ms. Theil approximately 24 times.[4] On March 9, 2009, Ms. Theil sent a letter regarding plaintiff's social security claim. The letter was also signed by Dr. Paolone. In the letter, Ms. Theil indicated that plaintiff "has a thirty year plus history of emotional and mental health symptoms that are chronic in nature, are episodically quite severe and consequently compromise her daily functioning."

---

[3] During the time period of November 7, 2007, through November of 2008, plaintiff also saw Anne Lewis-Nash for psychotherapy. Ms. Nash indicated that plaintiff presented with severe depression and suicidal thoughts. She noted the plaintiff appeared irritable and frustrated, and reported decreased motivation and concentration. Ms. Nash also noted during her mental status examination that plaintiff reported possible auditory hallucinations. Ms. Nash diagnosed plaintiff with major depressive disorder, panic disorder, and anxiety disorder.

[4] The Appeals Council considered the evidence submitted by plaintiff regarding Ms. Theil in rendering its decision.

She describes plaintiff's symptoms as follows: dysphoric and liable mood, irritability, adhedonia, sleep disturbance, sense of hopelessness and helplessness, fleeting suicidal ideation with a history of attempts, excessive worry, inability to relax, nervousness, social anticipation, overbearing guilt, racing thoughts, impaired concentration, distractibility, indecisiveness, low self-worth, fatigue, and low stress tolerance.

Plaintiff was diagnosed with "bipolar disorder, not otherwise specified, generalized anxiety disorder and personality disorder, not otherwise specified." The letter closes with the opinion that "due to the chronic and severe nature of these symptoms... I do not feel that [plaintiff] is able to be gainfully employed at this time, nor anytime within the near future."

On May 3, 2008, Karla Voyten, Ph.D., a state agency psychologist reviewed a portion of plaintiff's medical records. Voyten is not an examining source. It does not appear that Voyten reviewed the opinion of Dr. Drake. Nor did Voyten review any of the records or opinions of Dr. Paleone. Voyten opined that plaintiff was moderately limited in performing daily activities, maintaining social functioning, and maintaining concentration, persistence or pace. Voyten also noted "one or two" periods of decompensation of extended duration. Voyten noted plaintiff's 30-year work history at the same location and found plaintiff's allegations to be credible. Voyten also noted "weight to TS," which this Court interprets as "weight to treating source." Voyten noted that plaintiff showed some improvement across visits, and that medications appeared to improve her symptoms. Ultimately, Voyten opined that plaintiff is "capable of performing work which consists of simple, repetitive tasks in an environment where strict production quotas are not required where social interactio [sic] is superficial."

On September 26, 2008, Marianne Collins, Ph.D., opined simply, "I have reviewed the

7

evidence in file, and the assessment of 05/03/2008 is affirmed as written."

The ALJ held a hearing at which plaintiff testified. Plaintiff indicated that she typically woke her children up and then went back to bed or laid on the couch most of the day. Her children fixed their own food. She watched TV, but had difficulty concentrating on the programming. In large part, her children performed the household chores and she did not pay her own bills. She testified that her medications helped, but only if she maintained a "low-key" life. At the recommendation of Dr. Paolone, plaintiff used a tanning bed because she never went outside to get any sun.

The vocational expert ("VE") testified that an individual of plaintiff's age, education, and work history who was limited to simple, routine, and repetitive work performed in a low-stress environment with only occasional interactions with the public and co-workers would be able to perform work as a cleaner/housekeeper, packer, and laundry worker. However, the VE testified that an individual who missed work three or four times per month would be unable to maintain work. Nor would an individual who was "off task" for one hour per day be employable.

The ALJ denied plaintiff's application for period of disability and disability insurance benefits. In so doing, the ALJ rejected the opinions of treating physicians Drs. Drake and Paolone, as well as the opinion of Ms. Theil. The ALJ assigned the opinion of Dr. Drake "little weight" because the opinion was "not supported by the overall medical evidence of record." In large part, the ALJ noted that at certain sessions, plaintiff reported improvements in some symptoms. In addition, the ALJ noted that Dr. Drake assigned GAF scores to plaintiff falling within the "moderate symptoms" range. The ALJ further indicated that the record showed only one instance of hospitalization, which negated Dr. Drake's finding of "four or more episodes of

8

decompensation." The ALJ rejected Dr. Paolone's opinion and assigned it "little weight" for the same reasons discussed with respect to Dr. Drake.

The ALJ also rejected Ms. Theil's opinion. It appears that the ALJ assigned little weight to this opinion because Ms. Theil indicated that plaintiff had a "30 year" history of mental health problems and that the medical record contains no evidence supporting this statement. Moreover, it appears that Ms. Theil's progress notes were not provided to the ALJ, although they were in fact provided to the Appeals Council.

The ALJ indicated that he concurred with the opinion of the state agency psychologists, who indicated that plaintiff could "perform simple, repetitive tasks in an environment where strict production quotas were not required and social interaction was superficial."

The ALJ found that plaintiff "has exaggerated the nature and extent of her impairments." The ALJ further found plaintiff to be not "entirely credible." The ALJ pointed out that plaintiff was able to sustain gainful employment for 30 years, and had expressed great concern regarding her financial condition after her husband left her. In addition, the ALJ noted that Ms. Snyder indicated that plaintiff could work and, in fact, plaintiff returned to part-time work even if for a short time period.

The Appeals Council affirmed the ALJ's decision and this appeal followed. The Magistrate Judge recommends that the Court accept defendant's decision denying benefits. Plaintiff filed objections to the R&R and the government filed a response.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 72, which governs the matter herein inasmuch as timely objections have been made to the Report and Recommendation, provides in part:

9

> **(b) Dispositive Motions and Prisoner Petitions.**
> ...The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule.  The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

As stated in the Advisory Committee Notes, "The term 'de novo' signifies the magistrate's findings are not protected by the clearly erroneous doctrine, but does not indicate that a second evidentiary hearing is required." citing *United States v. Raddatz*, 447 U.S. 667 (1980).

## ANALYSIS

Plaintiff objects to the R&R on two grounds.  Plaintiff argues that the ALJ failed to properly apply the treating physician rule.  In addition, plaintiff claims that the ALJ failed to properly assess plaintiff's credibility.

The Magistrate Judge correctly set forth the applicable law regarding the treating physician rule:

> In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with other substantial evidence in the claimant's case record, it will be given controlling weight.  If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source–in determining what weight to give the opinion.  Even if the treating physician's opinion is not given controlling weight, there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great weight.  Opinions of a specialist with respect to the medical condition at issue are given more weight than a nonspecialist.

(R&R at p. 22)(citations and quotations omitted).

Plaintiff argues that the Magistrate Judge erred in concluding that the ALJ properly

applied the treating physician rule. According to plaintiff, the ALJ rejected the opinions of Drs. Drake and Paolone because their opinions were inconsistent with the GAF scores assigned to plaintiff and the record showed no hospitalizations. Plaintiff claims that the ALJ improperly concluded that the opinion that plaintiff suffered "four or more" periods of decompensation was erroneous because the medical record demonstrated a lack of hospitalizations. Plaintiff argues that the Magistrate Judge did not directly address these arguments. Rather, she concluded that the ALJ properly rejected the opinions of the treating physicians because there were no "laboratory tests" conducted. In addition, the Magistrate Judge concluded that the ALJ considered and properly applied the relevant factors in determining to give the opinions of plaintiff's treating psychiatrists "little weight."

On the other hand, the government argues that the Magistrate Judge was permitted to look to any evidence in the record, regardless of whether the ALJ relied on such evidence. In addition, the government argues that the ALJ did not rely exclusively on the GAF scores and lack of hospitalizations in rejecting the treating physicians' opinions. Rather, the government claims that the ALJ noted as follows:

- the opinions were "not consistent with the overall medical evidence of record," or the "psychiatrist[s'] own records which include Global Assessments of Functioning of moderate symptoms;

- the opinions were not consistent with the medical evidence of record, which contains only one report of hospitalization for a mental impairment for only six days;"

- Plaintiff reported no previous hospitalizations at the time of that admission; and

- the opinions were not supported by the overall medical evidence of record.

Upon review, the Court finds that the Magistrate Judge's conclusion that the ALJ

11

properly applied the treating physician rule is erroneous. The ALJ rejected the opinion of Dr. Drake as follows:

> The undersigned does not find the assessment of marked limitations to be consistent with the assessment of moderate symptoms in the Global Assessment Functioning. Furthermore, the finding of four or more episodes of decompensation is not consistent with the medical evidence of record, which contains only one report of hospitalization for a mental impairment for only six days. The undersigned notes that the claimant reported no previous psychiatric hospitalizations at the time of that admission. The undersigned gives little weight to these opinions as they are not supported by the overall medical evidence of record.

The ALJ, using nearly *identical* language, rejected the opinion of Dr. Paolone. Thus, contrary to the government's argument, the primary reason articulated by the ALJ for rejecting these opinions is precisely what the plaintiff complains of, namely the GAF scores and lack of hospitalizations. As plaintiff points out however, GAF scores alone do not directly address the severity of a claimant's symptoms. *See* 65 Fed. Reg. 50746, 50764-5 ("[the GAF scale] does not have a direct correlation to the severity requirements in our mental disorders listings.") Moreover, while hospitalizations may certainly provide evidence of "episodes of decompensation," nothing in the Regulations *require* that a claimant be hospitalized in order to qualify as an "episode of decompensation." Rather, episodes of decompensation are defined to be:

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).

Thus, it appears that the ALJ's bases for rejecting the opinions of plaintiff's treating physicians are misplaced. Moreover, nowhere does the ALJ directly address the factors relevant

12

to assigning less than controlling weight to the opinions of treating physicians.  For example, the ALJ does not mention the length of plaintiff's treatment relationship with Dr. Drake, nor does the ALJ discuss the fact that both Drs. Drake and Paolone are board certified psychiatrists.  The ALJ fails to mention the frequency of examination and fails to recognize that the opinions of both board-certified treating psychiatrists are largely consistent with each other and find the same types of limitations.  Notably, both opined that plaintiff suffered "four or more" periods of decompensation and both concluded that plaintiff would likely miss work more than 3-4 times per month.  These opinions are also consistent with the opinion or Ms. Theil, who saw plaintiff for pscyhotherapy on approximately 24 occasions.

  The ALJ purports to reject these opinions as "inconsistent with other substantial evidence."  It appears that the ALJ relies primarily on the opinion of non-treating, non-examining state agency psychologist Voyten.  Voyten, however, reviewed very little of the record evidence and did not consider the opinions of either psychiatrist.  Moreover, contrary to the conclusion of the ALJ, Voyten found plaintiff's "allegations credible," noting her positive work experience. The ALJ further notes a "gap in treatment," but as plaintiff correctly notes, no such gap in treatment exists. While there was a brief period where plaintiff did not see a psychotherapist, plaintiff was continuously under the care of a psychiatrist.[5]  The ALJ also relies on the opinion of Ms. Snyder, who, just shortly following plaintiff's inpatient hospitalization,

---

[5]   The Magistrate Judge also relied on this "gap in treatment."  In addition, the Magistrate Judge noted a "lack of laboratory tests" as a basis to support the ALJ's determinations.  As the Sixth Circuit has recognized, however, psychiatric impairment is not readily susceptible to objective laboratory testing. *See, e.g., Blakenship v. Brown*, 874 F.2d 1116 (6th Cir. 1989).

opined that plaintiff had no restrictions of any kind.   Yet, the ALJ does not appear to adopt Ms. Snyder's opinions.  Regardless, Ms. Snyder is not a treating specialist.

In all, the Court cannot say that the ALJ properly applied the treating physician rule. Here, the ALJ rejected the opinions of both board-certified treating psychiatrists in favor of a non-examining, non-treating source who reviewed only a fraction of the medical evidence.[6] The Court finds that remand is required so that the ALJ may properly apply the treating physician rule.  To the extent the ALJ decides to give these opinions less than "controlling weight," the ALJ must address each factor identified in this opinion to allow for proper appellate review.

Having concluded that this matter must be remanded in light of the failure of the ALJ to properly apply the treating physician rule, the Court need not address plaintiff's credibility argument.

**CONCLUSION**

For the foregoing reasons, the Court REJECTS the R&R, REVERSES the decision of the Commissioner, and REMANDS this matter to defendant for further proceedings consistent with this opinion.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/9/12

---

[6] The ALJ also relies on the opinion of Collins, who opined simply that "[she has] reviewed the evidence in file, and the assessment of 05/03/2008 is affirmed as written."

14